IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PANAMA CITY DIVISION

JILL DENISE BEOTE,
      Plaintiff,

vs.                                  Case No.: 5:12cv115/EMT

CAROLYN W. COLVIN,
Acting Commissioner of Social Security,[1]
      Defendant.
_____/

## MEMORANDUM DECISION AND ORDER

This case has been referred to the undersigned magistrate judge for disposition pursuant to the authority of 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73, based on the parties' consent to magistrate judge jurisdiction (*see* docs. 7, 8).  It is now before the court pursuant to 42 U.S.C. § 405(g) of the Social Security Act ("the Act"), for review of a final decision of the Commissioner of the Social Security Administration ("the Commissioner") denying Plaintiff's application for disability insurance benefits ("DIB") under Title II of the Act, 42 U.S.C. §§ 401–34.

Upon review of the record before this court, it is the opinion of the undersigned that certain findings of fact of the Commissioner are not supported by substantial evidence.  The decision of the Commissioner is therefore reversed and remanded for further proceedings.

I.      PROCEDURAL HISTORY

On January 23, 2008, Plaintiff filed an application for DIB, alleging disability beginning August 31, 2007 (tr. 15).[2]  Plaintiff's application was denied initially and on reconsideration, and

---

[1] Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013.  Pursuant to Fed. R. Civ. P. 25(d), she is therefore automatically substituted for Michael J. Astrue as the Defendant in this case.

[2] All references to "tr." refer to the transcript of Social Security Administration record filed on July 24, 2012 (doc. 10).  Moreover, the page numbers refer to those found on the lower right-hand corner of each page of the transcript, as opposed to those assigned by the court's electronic docketing system or any other page numbers that may appear.

thereafter she requested a hearing before an administrative law judge ("ALJ").  A hearing was held on June 29, 2010, at which Plaintiff was represented by counsel, and she and a vocational expert ("VE") testified.  On July 23, 2010, the ALJ issued a decision in which he found Plaintiff was "not disabled," as defined under the Act, at any time through the date of his decision (tr. 15–26).  The Appeals Council subsequently denied Plaintiff's request for review (*see* tr. 1).  Thus, the decision of the ALJ stands as the final decision of the Commissioner, subject to review in this court.  Ingram v. Comm'r of Soc. Sec. Admin., 496 F.3d 1253, 1262 (11th Cir. 2007).  This appeal followed.

II.    FINDINGS OF THE ALJ

In his July 23, 2010, decision the ALJ made the following findings:

1)    Plaintiff met the insured status requirements of the Act through September 30, 2011.

2)    Plaintiff has not engaged in substantial gainful activity since August 31, 2007, the alleged onset date.[3]

3)    Plaintiff has the following severe impairments: fibromyalgia by history; bipolar disorder; panic disorder with agoraphobia; pain disorder; and delusional disorder. Plaintiff is obese, but her obesity does not preclude the performance of most work activities.

4)    Plaintiff does not have an impairment or combination of impairments that meets or medically equals a listed impairment.

5)    Plaintiff has the residual functional capacity ("RFC") to perform light work, with certain limitations.[4]

---

[3]  Thus, the time frame relevant to this appeal is August 31, 2007 (the alleged onset date) to July 23, 2010 (the date of the ALJ's opinion), even though Plaintiff was insured through September 30, 2011, for DIB purposes.

[4]  "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls." 20 C.F.R. § 404.1567(b).  Plaintiff has the following limitations: she is not able to climb ladders, ropes or scaffolds; she may only occasionally engage in handling-gross manipulation with her left hand and may never engage in fingering or fine manipulation; she may not have concentrated exposure to extreme cold or extreme heat or to other hazards (tr. 19).  Plaintiff is able to perform simple, routine, repetitive tasks (*id.*).  She is able to understand, remember, and carry out simple instructions (*id.*).  She is able to adapt to gradual and infrequent changes in the work setting (*id.*).  She is able to maintain concentration and persistence for simple, routine, repetitive tasks (*id.*).  Plaintiff is limited to work that requires only superficial interaction with the public and co-workers (*id.*).

6)      Plaintiff is unable to perform any past relevant work.

7)      Plaintiff was born on June 12, 1969.  On her alleged disability onset date she was thirty-eight years old, which is defined as a younger individual aged 18–49.

8)      Plaintiff has at least a high school education and is able to communicate in English.

9)      The Medical-Vocational Rules, used as a framework for decisionmaking, support a finding that Plaintiff is "not disabled."  Thus, regardless of whether Plaintiff has transferable job skills, the transferability of job skills is not material to the disability determination.

10)     In light of Plaintiff's age, education, work experience, and RFC, and based on the testimony of the VE, jobs exist in significant numbers in the national economy that Plaintiff can perform.  These include surveillance system monitor; ticket taker; ticket seller; and officer helper.

11)     Plaintiff has not been under a disability, as defined in the Social Security Act, from August 31, 2007, through the date of the decision.

## III.   STANDARD OF REVIEW

Review of the Commissioner's final decision is limited to determining whether the decision is supported by substantial evidence from the record and was a result of the application of proper legal standards.  Carnes v. Sullivan, 936 F.2d 1215, 1218 (11th Cir. 1991) ("[T]his Court may reverse the decision of the [Commissioner] only when convinced that it is not supported by substantial evidence or that proper legal standards were not applied."); *see also* Lewis v. Callahan, 125 F.3d 1436, 1439 (11th Cir. 1997); Walker v. Bowen, 826 F.2d 996, 999 (11th Cir. 1987).  "A determination that is supported by substantial evidence may be meaningless . . . if it is coupled with or derived from faulty legal principles."  Boyd v. Heckler, 704 F.2d 1207, 1209 (11th Cir. 1983), *superseded by statute on other grounds as stated in* Elam v. R.R. Ret. Bd., 921 F.2d 1210, 1214 (11th Cir. 1991).  As long as proper legal standards were applied, the Commissioner's decision will not be disturbed if in light of the record as a whole the decision appears to be supported by substantial evidence. 42 U.S.C. § 405(g); Falge, 150 F.3d at 1322; Lewis, 125 F.3d at 1439; Foote v. Chater, 67 F.3d 1553, 1560 (11th Cir. 1995).  Substantial evidence is more than a scintilla, but not a preponderance; it is "such relevant evidence as a reasonable person would accept as adequate to

support a conclusion." <u>Richardson v. Perales</u>, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427, 28 L. Ed. 2d 842 (1971) (quoting <u>Consolidated Edison Co. v. NLRB</u>, 305 U.S. 197, 59 S. Ct. 206, 217, 83 L. Ed. 126 (1938)); <u>Lewis</u>, 125 F.3d at 1439. The court may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the Commissioner. <u>Martin v. Sullivan</u>, 894 F.2d 1520, 1529 (11th Cir. 1990) (citations omitted). Even if the evidence preponderates against the Commissioner's decision, the decision must be affirmed if supported by substantial evidence. <u>Sewell v. Bowen</u>, 792 F.2d 1065, 1067 (11th Cir. 1986).

The Act defines a disability as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). To qualify as a disability the physical or mental impairment must be so severe that the claimant is not only unable to do her previous work, "but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." *Id*. § 423(d)(2)(A).

Pursuant to 20 C.F.R. § 404.1520(a)–(g),[5] the Commissioner analyzes a disability claim in five steps:

1. If the claimant is performing substantial gainful activity, she is not disabled.

2. If the claimant is not performing substantial gainful activity, her impairments must be severe before she can be found disabled.

3. If the claimant is not performing substantial gainful activity and she has severe impairments that have lasted or are expected to last for a continuous period of at least twelve months, and if her impairments meet or medically equal the criteria of any impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, the claimant is presumed disabled without further inquiry.

4. If the claimant's impairments do not prevent her from doing her past relevant work, she is not disabled.

---

[5] In general, the legal standards applied are the same regardless of whether a claimant seeks DIB or SSI, but separate, parallel statutes and regulations exist for DIB and SSI claims (*see* 20 C.F.R. §§ 404. 416). Therefore, citations in this Order should be considered to refer to the appropriate parallel provision. The same applies to citations of statutes or regulations found in quoted court decisions.

5.     Even if the claimant's impairments prevent her from performing her past relevant work, if other work exists in significant numbers in the national economy that accommodates her RFC and vocational factors, she is not disabled.

The claimant bears the burden of establishing a severe impairment that keeps her from performing her past work. 20 C.F.R. § 404.1512. If the claimant establishes such an impairment, the burden shifts to the Commissioner at step five to show the existence of other jobs in the national economy which, given the claimant's impairments, the claimant can perform. MacGregor v. Bowen, 786 F.2d 1050, 1052 (11th Cir. 1986). If the Commissioner carries this burden, the claimant must then prove she cannot perform the work suggested by the Commissioner. Hale v. Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987).

IV.    HEARING TESTIMONY AND MEDICAL HISTORY

A.     Hearing Testimony

At the June 29, 2010, administrative hearing, Plaintiff testified that her prior work consisted of jobs as a dispatcher, secretary, licensed practical nurse, assistant manager, cashier clerk, receptionist, and case manager (tr. 39–42). Plaintiff stated that she has a driver's license but cannot drive due to pain from spasms (tr. 42). According to Plaintiff, she is unable to work due to her fibromyalgia, which has worsened since first being diagnosed in 2006 (tr. 43; 50–51). Plaintiff, who is right-handed (tr. 42), also testified that she cannot use her left hand, after she underwent surgery to repair a wrist fracture and developed a severe infection in the hand (tr. 43–44). Her physician, she stated, advised her that once her hand healed from the surgery she should not lift more than five pounds (tr. 47). Additionally, Plaintiff reported that she has a central line installed in her arm that provides her with iron intravenously, which she requires due to poor absorption of nutrients following a gastric bypass procedure in 1999 (tr. 45; 51). Plaintiff also suffers from osteoporosis and asthma (tr. 52). Plaintiff stated that weather conditions cause her asthma to flare up, and then she develops bronchitis or other chest conditions (tr. 53). Due to constant pain associated with her fibromyalgia, Plaintiff testified, she experiences difficulty lifting, bending, twisting, turning, sitting, walking, and standing (tr. 45; 51). Additionally, she "can't lift and carry anything" (tr. 46). She can stand or walk approximately ten to fifteen minutes at a time (tr. 45–46) and spends most of each day lying down and

watching television (tr. 46; 53). Plaintiff testified that she could not sit for six hours during an eight hour workday (tr. 46) and that, on a ten-point scale with ten being the worst pain, her pain was a seven or eight (tr. 51). Plaintiff has been taking Lyrica for her fibromyalgia but no longer gets much relief from it (tr. 46; 51).

Plaintiff also indicated at the administrative hearing that she suffers from bipolar disorder, depression, and personality disorder (tr. 48). She has received medication in the past for these conditions, which was prescribed by her family doctors, but she did not currently receive treatment because she cannot afford it (*id.*). Plaintiff testified that she becomes stressed when leaving her house, and she becomes very nervous "around even people" (tr. 53). She also stated that her "memory's not that great these days" (tr. 49).

Following Plaintiff's testimony, the ALJ questioned the VE. Posing a hypothetical question, the ALJ asked the VE to assume an individual who was

> [R]estricted to light exertion activity; further assume that she cannot perform any climbing of ladders, ropes, or scaffolds or any fingering—fine manipulation with the left upper extremity; further assume that she cannot perform more than occasional handling or gross manipulation with the left upper extremity; assume that I find that she cannot have any concentrated exposure to hazards or temperature extremes.
>
> Mentally assume she is restricted to simple, routine, repetitive tasks; understanding, remembering, and carrying out simple instructions; adapting to gradual and infrequent changes in the work setting; assume that she is able to maintain concentration and persistence for only simple, routine, repetitive tasks; and finally assume that she is limited to work that requires no more than occasional interaction with the public or co-workers.

(tr. 55–56).

The VE indicated that the hypothetical individual described would be unable to perform any of Plaintiff's past work (tr. 56). The individual could, however, perform the jobs of surveillance system monitor, ticket taker, ticket seller, and office helper (tr. 56–59).

The ALJ then posed a second hypothetical question to the VE:

> Assume the same mental limitations as in hypo number one, but physically assume that I adopt the claimant's allegations and find them credible and find that she is not capable of performing work at any exertional level due to her pain, weakness, and fatigue on a consistent basis for eight hours a day, 40 hours a week. Given the limitations in hypothetical number two, would she be capable of performing her past work?

(tr. 59).

The VE indicated that the hypothetical individual would be unable to perform Plaintiff's past work or any other work in the national economy (*id.*).

B.     Plaintiff's Medical History[6]

Treating Physicians

In October 2003 Fernando C. Malamud, M.D., noted that Plaintiff suffered from iron deficiency anemia, secondary to a gastric bypass several years earlier, that required periodic intravenous iron replacement (tr. 229).  In January 2006 Plaintiff was treated for gynecological complaints by Dr. Samuel Ward (tr. 223).  Plaintiff also report left hip pain, for which no assessment or treatment was provided (*id.*).  In May 2007 Dr. Malamud assessed Plaintiff with iron deficiency anemia and B12 deficiency, the latter of which was also a result of her gastric bypass procedure (tr. 228).  Dr. Malamud noted in June 2007 that Plaintiff was having some trouble with her peripherally inserted central catheter ("PICC"), which was used to infuse iron to treat her anemia (tr. 227).

Medical records from The Health Clinic, mostly from 2008, include Plaintiff's complaints—but little in the way of objective findings—of attention deficient disorder ("ADD") (tr. 281; 287); anemia (tr. 287); osteoarthritis (tr. 289; 290; 291); pain from fibromyalgia (tr. 288); right extremity pain (tr. 281); and right ear pain (tr. 287).[7]

---

[6] The court's July 25, 2012, Scheduling Order, in relevant part, directs Plaintiff to "specifically cite the record by page number for factual contentions," and it further informs that the "[f]ailure . . . to support factual contentions with accurate, precise citations to the record will result in the contention(s) being disregarded for lack of proper development." (doc. 13 at 1–2, emphasis in original).  In light of this instruction, the court has relied heavily on Plaintiff's citations to the record in summarizing Plaintiff's medical history.  In the Discussion section, the court refers to this evidence, as appropriate, as well as to other record evidence contained in the transcript.
        The court notes, however, that numerous of Plaintiff's citations do not comply with the court's instructions in its Scheduling Order that citations to the record must be precise.  Rather, many of Plaintiff's references consist of a long string of impairments followed by a long string of page citations that are not correlated to specific impairments (*see, e.g.,* doc. 14 at 7, second full paragraph; *id.* at 15, first paragraph; *id.* at 19, first partial and second full paragraphs).  Such references are unacceptable.  Instead of saving the court's time in locating references, this practice lengthens it, requiring the court to search each page for numerous—but not clearly identified—possible matches.  In the future, counsel must refrain from using this technique but rather must carefully comply with the court's instructions to provide accurate, precise citations to the record—or face the consequences for the failure to do so.

[7] The handwritten records from The Health Clinic are largely illegible.  The court has made its best effort to decipher these and other illegible entries in the record, including numerous pages of handwritten notes from the office of treating physician John F. Simmons, M.D.

On May 24, 2008, Plaintiff was seen at the Southeast Alabama Medical Center ("SAMC") emergency room (tr. 717–18).  Plaintiff was diagnosed with a fracture of the left wrist, which she indicated had occurred when she tried to break a fall.  Surgery to repair a comminuted fracture of the wrist by external fixation and closed reduction was performed on May 26, 2008 (tr. 711).  Plaintiff returned to the SAMC Emergency Room in July 2008 with complaints of severe left wrist pain that radiated into the fingers of her left hand (tr. 701).

John F. Simmons, M.D., saw Plaintiff commencing in November 2008, for numerous complaints; his records include reports of fibromyalgia (tr. 367; 369; 370; 619; 645); increased muscle pain from fibromyalgia (tr. 351; 353; 367); anemia (tr. 369; 370; 395); sinusitis, which sometimes included headache and ear pain (tr. 355; 365; 645; 652); swelling and pain of the left foot and ankle (tr. 357–58; 632); and a history of attention deficit hyperactivity disorder ("ADHD") (tr. 369–70; 625; 652; 648).  Dr. Simmons' records also reflect that Plaintiff was prescribed Lyrica, Adderall for ADHD, vitamin B12, and Proventil for asthma (tr. 342; 349; 369; 625).  A bone density scan in February 2009 revealed that Plaintiff was osteoporotic with a high risk of fracture (tr. 359).  She was advised to start pharmacological treatment, if it was not already prescribed, and Dr. Simmons recommended that Plaintiff undergo a follow-up bone density scan in February 2011 (*id.*).  Dr. Simmons saw Plaintiff for increased fibromyalgia pain in March 2009 (tr. 351) and for left hand pain in April 2009, when she reported she was unable to move her left index finger (tr. 349–50).  She reported severe, throbbing left hand pain in May 2009, at which time Dr. Simmons assessed Plaintiff with osteomyelitis and prescribed antibiotics (tr. 342).

Plaintiff was seen at the Hughston Clinic on May 20, 2009, by Champ L. Baker, M.D., for an assessment of her left hand and wrist (tr. 328–29, duplicate at 340–41).  Dr. Champ diagnosed Plaintiff with left hand second metacarpal osteomyelitis secondary to an external fixator pin which had been inserted the previous year (tr. 329).  He recommended an evaluation by a hand specialist "for this very difficult problem" and referred Plaintiff to David Rehak, M.D., for further care (*id.*).  On May 21, 2009, Plaintiff presented to Doctor's Memorial Hospital for swelling in her feet and knees and increased shortness of breath on exertion (tr. 376–77).  A chest x-ray revealed no abnormalities (tr. 380).

On June 9, 2009, Dr. Simmons saw Plaintiff for left hand pain; Dr. Simmons assessed Plaintiff with osteomyelitis, fibromyalgia, and anemia, and he noted that Plaintiff had an appointment to see Dr. Rehak the following month (tr. 332–33).  Dr. Simmons also completed a Clinical Assessment of Pain form for Plaintiff (tr. 331).  In response to the question, "To what extent is pain of significance in the treatment of this patient?" he opined that Plaintiff had pain to such an extent as to be distracting to adequate performance of daily activities or work.  Dr. Simmons also opined that physical activity (such as walking, standing, sitting, bending, stooping, moving of extremities, etc.) increased Plaintiff's pain somewhat but not to the extent it prevented adequate functioning and that the side effects of prescribed medication would present some limitations but not to such a degree as to create serious problems in most instances (*id.*).

A report prepared by Folarin Olubowale, M.D., in July 2009 notes Plaintiff's complaint of left hand pain, with an otherwise largely normal physical examination and no other complaints of pain (tr. 399).  William R. LaHouse, M.D., also examined Plaintiff in July 2009;  his assessment was fibromyalgia, chronic fatigue, possible methicillin-resistant staphylococcus aureus ("MRSA") osteomyelitis, history of severe gastrointestinal bleed, and status post gastroplasty (tr. 402).  A computerized tomography ("CT") scan of Plaintiff's left hand on July 16, 2009, showed bony expansion along the shaft of the second metacarpal with bony destruction and resorption, and sclerotic changes associated with osteomyelitis (tr. 627).  An Admission History & Physical Assessment dated July 20, 2009, reflects Plaintiff's complaint of left hand pain (tr. 601–02). Elizabeth Robinson, M.D., examined Plaintiff on July 21, 2009, and diagnosed MRSA.  She advised Plaintiff that she would require long-term intravenous antibiotics through the use of a Groshong cardiac catheter, which Dr. Robinson installed (tr. 406–07).  Following this procedure, Dr. Rehak debrided and drained the infected tissue in Plaintiff's left hand (tr. 403–07), and Plaintiff was started on long-term intravenous antibiotic therapy using the Groshong cardiac catheter (tr. 473–505).  Dr. Rehak noted on August 5, 2009, that Plaintiff had very good range of motion of her fingers with only minimal swelling and no signs of continued infection at that time (tr. 417).  On August 18, 2009, Plaintiff reported to Dr. Olubowale that she felt extremely tired, and he ordered two sets of blood cultures, "one from the central line and one from the peripheral site," to assess possible infection (tr. 441, duplicate at 624).

On August 20, 2009, Plaintiff presented to the SAMC Emergency Room with severe headache, fever, and left hand pain and pain from the Groshong cardiac catheter (tr. 689).  She refused hospitalization and returned home (*see* tr. 621).  On August 21, 2009, after the hospital made urgent attempts to locate her due to a rapidly growing gram negative culture, Plaintiff agreed to be hospitalized; she was admitted to SAMC with complaints of headache and generalized fatigue and diagnosed and treated with intravenous antibiotics for a bacteremia caused by pseudomonas aeruginosa in the Groshong cardiac catheter (tr. 574–77; 621–23; 664–65).  The Groshong cardiac catheter was removed (tr. 622), and a PICC line was inserted in Plaintiff's left arm (tr. 573).  Plaintiff's medications at discharge included Lyrica, Adderall, and vitamin B12, as well as antibiotic, antifungal, and pain medications (tr. 665).  Plaintiff saw Dr. Simmons on August 31, 2009, when she complained of fatigue and "feel[ing] bad" (tr. 619).  He advised Plaintiff to obtain an orthopedic reevaluation and instructed Plaintiff's home health care nurse to take blood cultures (*id.*).

On September 3, 2009, Plaintiff was treated at the SAMC Emergency Room for fever and severe headache (tr. 659).  A computerized tomography ("CT") scan of the head was negative (tr. 660).  Plaintiff was given strict instructions for follow-up care, and it was noted that her PICC line might need to be removed if blood chemistries were positive for infection (*id.*).  On September 9, 2009, Plaintiff underwent x-rays of her left hand after complaining of increased pain for the past ten days (tr. 415).  Although Plaintiff could not recall any recent injury (*id.*), the x-rays revealed a fractured thumb through the area where the debridement was, which fracture Dr. Rehak reported was stable (tr. 416).  It was recommended that Plaintiff's wrist and hand be placed in a splint (tr. 415).  Plaintiff was seen by Dr. Olubowale on September 9, 2009 (tr. 431), and he removed the PICC line from the peripheral site on Plaintiff's left arm and placed her on additional medications (*id.*).

Plaintiff presented to the Northwest Florida Community Hospital Emergency Room with upper respiratory symptoms and myalgias on September 24, 2009 (tr. 467).  The impression was shortness of breath and pneumonia; Plaintiff signed out of the hospital against medical advice (tr. 468).

Plaintiff presented to the Vernon Family Health Center in November 2009 as a new patient (tr. 635).  Her affect was described as calm and cooperative.  She was assessed with status post gastric bypass; seasonal depression; short term memory loss; and anemia (*id.*).  She reported that, among

other treatments, she was prescribed vitamin B12, Adderall, and Lyrica (*id.*).  Plaintiff returned to the Clinic in December 2009, when she was assessed with an upper respiratory infection/sinusitis and ADHD, and prescriptions for Adderall and Lyrica were refilled (*id.*).

An orthopedic assessment dated December 2, 2009, by Dr. Rehak noted Plaintiff's complaints of continued stiffness and minimal pain, with a "constant dull throbbing" pain following a recent fall (tr. 639).  Dr. Rehak noted nothing remarkable on vascular, sensory, and stability examinations (*id.*).  The scars of the left hand looked "excellent" but there was some generalized swelling, which appeared to be somewhat chronic or perhaps slightly acute (*id.*).  Also, there was some decreased motion with stiffness of the index finger and some tenderness to palpation but no crepitance (*id.*).  An x-ray revealed thickening of the cortex with the fracture site still visible, but it did not appear to be unstable (*id.*).  Dr. Rehak recommended the use of an edema glove and splint for several weeks to "let this settle down," then a recheck (*id.*).  Dr. Rehak agreed to refill a prescription for Vicodin but informed Plaintiff he would not continue to do so much longer.

Plaintiff was seen at Family Health Care of Chipley in March 2010 to become established as a new patient (tr. 724).  She reported that she was out of her blood pressure medication and needed prescription refills, but she reported no other new complaints (*id.*).  The assessment was hypertension, ADD without hyperactivity, depressive disorder, and history of tobacco use.  She was given numerous prescriptions, including Abilify and fluoxetine for depression, Adderall, Lyrica, diuretics, vitamins, and a smoking cessation product (tr. 725–27).  Plaintiff returned to Family Health Care of Chipley in April 2010 for a follow-up visit (tr. 723–24), at which time she reported having pulled a muscle in her back over the weekend, causing muscle spasms and pain in her lower back.  On examination, point tenderness of the lumbar spine was noted (tr. 723). She denied any presyncope or syncope (*id.*).  Cymbalta was added to Plaintiff's medications, and Vyvanse was prescribed in place of Adderall (tr. 724).

<u>Examining and Non-Examining Medical Consultants</u>

Sam R. Banner, D.O., conducted a consultative physical examination of Plaintiff on June 12, 2008 (tr. 237–40).  He noted that Plaintiff's physical complaints included fibromyalgia and a recent left wrist fracture (tr. 237).  On examination, Dr. Banner noted no paravertebral spasms or bony

abnormalities (tr. 239).  He observed that Plaintiff got on and off the table stiffly and that she moved slowly and cautiously (*id.*).  Dr. Banner noted mild ataxia during the heel/toe walk.  Muscle strength in Plaintiff's legs and right arm was 4/5; her left arm could not be tested due to her left wrist fracture and external fixation (tr. 240).  Sensation was intact, reflexes of the right arm and legs were normal, muscle tone was normal, and there was no evidence of muscle atrophy (*id.*).  Fine and gross motions in both hands were satisfactory (*id.*).  Plaintiff was able to button and unbutton her clothing without difficulty (*id.*).

On July 14, 2008, Edward Holifield, M.D., a non-examining State agency consultant, reviewed the evidence of record and completed a physical RFC assessment for twelve months after Plaintiff's wrist fracture on May 24, 2008, or for May 24, 2009 (tr. 247; *see also* tr. 248  stating that assessment of "light RFC [was] projected to 5/24/2009")).  Dr. Holifield found that, as of the projected date, Plaintiff would have the ability to occasionally lift and/or carry twenty pounds, frequently lift and/or carry ten pounds, stand and/or walk about six hours in an eight-hour workday, and sit about six hours (tr. 248).  Her ability to push and/or pull (including the operation of hand and/or foot controls) would be unlimited, other than as he had indicated for lifting and/or carrying.  In support of these conclusions, Dr. Holifield noted Plaintiff's history of gastric bypass surgery; fibromyalgia; left wrist fracture on May 24, 2008, with external fixation; and reported history of blackouts (tr. 248).  Dr. Holifield also noted that Plaintiff's grip in the left hand had not been tested due to her injury but that strength in the right hand was normal; also, her fine manipulation was normal bilaterally.  He noted that Plaintiff was reported as having a slow, cautious gait and used no assistive device.  Dr. Holifield found no postural, manipulative, visual, communicative, or environmental limitations, with the exception that Plaintiff should avoid concentrated exposure to hazards, such as machinery and heights (tr. 249–51).

Robert Steele, M.D., a State agency non-examining consultant, also completed a physical RFC assessment for Plaintiff, effective as of the date of his evaluation on October 9, 2008 (tr. 293–300).  Dr. Steele's assessment of Plaintiff's exertional, postural, manipulative, visual, communicative, and environmental limitations was identical to Dr. Holifield's, other than finding no restriction with respect to exposure to hazards.

George L. Horvat, Ph.D., performed a mental examination of Plaintiff in June 2008 at the request of the Commissioner (tr. 242–46). Plaintiff cited bipolar disorder, depression, insomnia, blackouts, fibromyalgia, anemia, and anger issues as her chief complaints (tr. 242). Plaintiff also stated that she blacked out and suffered violent episodes that she did not recall afterward (*id.*). Dr. Horvat noted that Plaintiff was tense, had tremors, was tearful and depressed, and avoided making eye contact (*id.*). Dr. Horvat diagnosed Plaintiff with bipolar disorder, current mood depressed; panic disorder with agoraphobia; pain disorder; and delusional disorder (tr. 245).

In July 2008 Thomas Conger, Ph.D., a State agency non-examining psychologist, completed a Psychiatric Review Technique (tr. 255–68), in which he found that Plaintiff had bipolar disorder, in partial remission (tr. 258); anxiety disorder, not otherwise specified (tr. 260); borderline personality disorder (tr. 262); and substance addiction disorder (tr. 263). Dr. Conger opined that Plaintiff had mild restrictions in activities of daily living and moderate difficulties in social functioning and with concentration, persistence and pace. She had experienced no episodes of decompensation (tr. 265). He further noted that although Plaintiff might experience depression and/or anxiety at times, she remained functional from a mental perspective. In the mental RFC he prepared, Dr. Conger found that Plaintiff was not significantly limited in most areas but was moderately limited with respect to the ability to maintain attention and concentration and to complete a normal workday and workweek; to accept instructions and respond appropriately to criticism from supervisors; and to get along with co-workers (tr. 269–70). According to Dr. Conger, Plaintiff was mentally capable of performing routine tasks on a sustained basis, showed the ability to relate effectively in general despite some social difficulties and negative reactions to criticism, and had adequate understanding and adaption abilities (tr. 271).

State agency psychologist Gildegardo Alidon, M.D., reviewed Plaintiff's records on December 16, 2008 (tr. 301–17). He reached conclusions similar to those expressed by Dr. Conger, including with respect to mental functional limitations (tr. 311), although he did not find substance addiction disorder (tr. 301). Also, Dr. Alidon determined, unlike Dr. Conger, that Plaintiff was moderately limited in the ability to understand, remember, and carry out detailed instructions (tr. 315). He found no significant limitation with respect to the ability to complete a normal workday or accept

instructions and respond to criticism from supervisors, and he found a moderate limitation with respect to interacting appropriately with the public and co-workers (tr. 316).  He concluded that despite her limitations, Plaintiff "could adequately attend and perform simple and repetitive tasks" (tr. 317).

Plaintiff was seen at the Life Management Center in January 2009 for an "Interactive Core Assessment" (tr. 741–52).  The one-time examining social worker diagnosed bipolar disorder (current hypomania) and personality disorder, and opined that Plaintiff had a current Global Assessment of Functioning ("GAF") score of 45, which indicated she had serious psychological symptoms[8] (tr. 751).

## V.    DISCUSSION

Plaintiff's grounds for relief, in the order in which the court addresses them, are that the ALJ erred by 1) failing to find at step two that her osteoporosis, headaches, asthma, anemia, and ADHD are severe impairments; 2) failing to support the RFC assessment with a treating or examining physician's assessment; 3) discounting Plaintiff's credibility; 4) failing to include a "function-by-function" assessment as required by Social Security Ruling ("SSR") 96-8p; and 5) relying on the VE's testimony without explaining inconsistencies between the VE's testimony and the Dictionary of Occupational Titles.  She seeks reversal and remand with an award of benefits or, alternatively, remand for further proceedings (doc. 14 at 25).  As discussed below, although the court generally finds Plaintiff's arguments to be unpersuasive, it nevertheless concludes that remand is necessary for the ALJ to reassess her RFC.

Ground 1

At step two of the sequential evaluation process, a claimant must prove she is suffering from a severe impairment or combination of impairments, that have lasted (or must be expected to last) for a continuous period of at least twelve months, and which significantly limit her physical or mental ability to perform "basic work activities."  *See* 20 C.F.R. §§ 404.1509, 404.1520(c), 404.1521(b).

---

[8] GAF is the overall level at which an individual functions, including social, occupational, academic, and other areas of personal performance. Diagnostic and Statistical Manual of Mental Disorders 30–32 (4th ed. 1994).  It may be expressed as a numerical score.  *Id.* at 32.  A score between 41 and 50 reflects serious symptoms or any serious impairment in social, occupational, or school functioning. *Id.*

Basic work activities include mental functions such as understanding, carrying out, and remembering simple instructions; using judgment; responding appropriately to supervision, co-workers and usual work situations; and dealing with changes in a routine work setting; basic work activities also include physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; and capacities for seeing, hearing, and speaking. 20 C.F.R. § 404.1521(b)(1)–(6). An impairment can be considered non-severe "only if it is a slight abnormality which has such a minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education, or work experience." Brady v. Heckler, 724 F.2d 914, 920 (11th Cir. 1984). At step two, the claimant bears the burden of introducing sufficient evidence to establish a severe impairment or combination of impairments. Bowen v. Yuckert, 482 U.S. 137, 146– 47, 107 S. Ct. 2287, 96 L. Ed. 2d 119 (1987); Jones v. Apfel, 190 F.3d 1224, 1228 (11th Cir. 1999).

Here, the evidence Plaintiff cites in support of her argument that the ALJ erred by not finding her osteoporosis, headaches, asthma, anemia, and ADHD to be severe impairments is insufficient to satisfy her step two burden. The evidence to which Plaintiff points, and which the court reviewed page-by-cited page, fails to show that any of these impairments would significantly limit Plaintiff's ability to perform basic work-related activities during the relevant period of August 31, 2007, to July 23, 2010. For example, some of the records relate to the period prior to Plaintiff's alleged onset date, such as certain entries from Dr. Malamud (tr. 227–29) and Dr. Ward (tr. 222–23). Others entries merely reflect that Plaintiff was being prescribed medications for asthma, anemia and ADHD, but the entries appear to contain few or no supporting objective findings that suggest the conditions would significantly limit Plaintiff's ability to perform work activities (*see* tr. 287–91; 355; 365; 369; 395; 608; 632; 635; 652; 724). Plaintiff did complain of headaches occasionally, but these reports largely appear to be associated with certain transitory complaints, such as fever or infection (*see* tr. 355; 365; 574; 659; 689). Furthermore, with respect to her osteoporosis, the references to which Plaintiff points in the record appear to contain scant mention of this condition,[9] other than the diagnosis of

---

[9] While much of the evidence pertains to Plaintiff's osteomyelitis condition (the bone infection in Plaintiff's left hand that apparently started to develop in April 2009 and was resolved by October 2009), Plaintiff does not mention this condition by name in her memorandum; rather, she refers only to her osteoporosis—which is a separate,

osteoporosis, along with the caution that Plaintiff was at high risk of bone fracture (tr. 359). While this diagnosis and caution are concerning, they simply are insufficient to support a finding that Plaintiff's osteoporosis significantly interferes with her ability to work.[10]

For all of the foregoing reasons, the court finds that Plaintiff's step two argument fails.

Grounds 2 and 3

Next, the court addresses Plaintiff's contention that the ALJ was required, but failed, to support the RFC assessment with a treating or examining physician's RFC assessment. Citing SSR 83-10, Plaintiff first submits that the RFC is a medical assessment and therefore "the ALJ is required to have evidence from a physician which supports his RFC assessment given that it is by definition 'a medical assessment.'" (doc. 14 at 9).

In the Eleventh Circuit, Social Security Rulings are not binding on the courts, although they are entitled to deference. Fair v. Shalala, 37 F.3d 1466, 1467 (11th Cir. 1994). No deference is due, however, if the ruling is inconsistent with a regulation; instead, the regulation controls. *See* Langley v. Astrue, 777 F. Supp. 2d 1250, 1253 (N.D. Ala. 2011) (citation omitted). In 1991, some eight years after SSR 83-10 was issued, § 404.1545—which in part SSR 83-10 cites as authority—was amended to delete language that defines the RFC as a medical assessment. The current version provides in pertinent part: "Your residual functional capacity is the most you can still do despite your limitations. We will assess your residual functional capacity based on all the relevant evidence in your case record." § 404.1545(a). Moreover, § 404.1527(a)(2) provides that "Medical opinions are statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what

---

distinct condition.

[10] The court recognizes that the record reflects Plaintiff suffered two bone fractures between May 2008 and September 2009, the first to her left wrist (from a reported fall) and the second to her left thumb (from an unknown cause). Plaintiff points to nothing in the medical record which correlates her diagnosed high risk of bone fracture from osteoporosis to either of these injuries, and the court located nothing. And, of course, it is not for the court to make such a correlation. As explained, this case is being remanded for further consideration of Plaintiff's RFC. On remand, the ALJ will also have the opportunity to develop the record further concerning Plaintiff's osteoporosis, including her susceptibility to bone fracture, and to reassess whether this condition satisfies the requirements of a severe impairment.

you can still do despite impairment(s), and your physical or mental restrictions."  Another subsection of § 404.1527 specifically provides that opinions on issues reserved to the Commissioner are not medical opinions:

> Medical source opinions on issues reserved to the Commissioner.  Opinions on some issues, such as the examples that follow, are not medical opinions, . . . but are, instead, opinions on issues reserved to the Commissioner because they are administrative findings that are dispositive of a case; i.e., that would direct the determination or decision of disability.

§ 404.1527(d).  One of the listed examples states that "Although we consider opinions from medical sources on issues such as . . . your residual functional capacity . . . the final responsibility for deciding these issues is reserved to the Commissioner.  § 404.1527(d)(2).

In short, this court agrees with <u>Langley</u>, which stated that under "the current regulations, a claimant's RFC is specifically excluded from being considered a medical opinion, and thus cannot be a medical assessment."  <u>Langley</u>, 777 F. Supp. 2d at 1253.  The court then held that because "the language in SSR 83-10 that defines RFC as a medical assessment is inconsistent with, and contrary to, the current regulations," the definition of  RFC contained in SSR 83-10 has been superceded by regulation."  *Id.*

Additionally, Plaintiff's reliance on <u>Coleman v. Barnhart</u>, 264 F. Supp. 2d 1007 (S.D. Ala. 2003) (concluding that at step five the burden is on the Commissioner to establish claimant's RFC through the RFC assessment of a treating or examining physician), and <u>Thomason v. Barnhart</u>, 344 F. Supp. 2d 1326 (N.D. Ala. 2004) (finding that lack of a formal assessment by an examining or non-examining physician of claimant's RFC was one of six reasons why substantial evidence did not support ALJ's decision denying benefits), is unavailing.  In <u>Langley</u>, the court concluded that "the law of this Circuit does not require an RFC from a physician."  <u>Langley</u>, 777 F. Supp. 2d at 1257–60.  The court declined to accept the position taken in <u>Coleman</u> because its reasoning "attempt[s] to place the burden of proving the claimant's RFC on the Commissioner at step five" and this shifting of the burden is "inconsistent with the Commissioner's regulations, Supreme Court precedent and unpublished decisions in this Circuit."  *Id.* at 1260.  This court agrees with the view expressed in <u>Langley</u>.  This court further notes that numerous other courts have also disagreed with the conclusions in <u>Coleman</u>

and Thomason, recognizing that an ALJ's RFC determination may be upheld even when there is no RFC assessment by a treating or examining physician. *See* Holloman v. Colvin, Case No. 2:12cv538-CSC, 2013 WL 2903287 (M.D. Ala. June 13, 2013); Webb v. Colvin, Case No. 3:12cv506-CSC (WO), 2013 WL 2567556 (M.D. Ala. June 11, 2013); Nelson v. Colvin, Case No. 2:12cv498-TFM (M.D. Ala. April 25, 2013); Packer v. Astrue, Case No. 11-0084-CG-N, 2013 WL 593497 (S.D. Ala. Feb.14, 2013); Daniels v. Astrue, Case No. 2:11-cv-569-TFM, 2012 WL 1564415 (M.D. Ala. April 30, 2012); and Daniels v. Astrue, Case No. 2:11-cv-371-TFM, 2012 WL 353756 (M.D. Ala. Feb. 2, 2012).[11] The court therefore rejects Plaintiff's contention that the ALJ was required to support his RFC assessment with a treating or examining physician's RFC assessment.

Nevertheless, the court is unable to conclude that the ALJ's physical RFC assessment is supported by substantial evidence.[12] In making his RFC determination that Plaintiff could perform a reduced range of light work, the ALJ gave "substantial" or "great" weight to the June 12, 2008, report of examining physician Dr. Banner; the July 14, 2008, RFC assessment of non-examining physician

---

[11] Plaintiff's counsel in the instant case represented the claimant in three of the above cases (Holloman v. Colvin, Case No. 2:12cv538-CSC, 2013 WL 2903287 (M.D. Ala. June 13, 2013); Daniels v. Astrue, Case No. 2:11-cv-569-TFM, 2012 WL 1564415 (M.D. Ala. April 30, 2012); and Daniels v. Astrue, Case No. 2:11-cv-371-TFM, 2012 WL 353756 (M.D. Ala. Feb. 2, 2012)). While the Holloman case was not decided until after counsel in this case filed his memorandum in support of the complaint on November 21, 2012, both of the Daniels cases had been decided. Counsel obviously was aware of these cases when he submitted his instant memorandum yet he cited neither case, both of which disagree with Coleman; the earlier Daniels case (decided on February 2, 2012), also discusses Thomason's lack of citation to any legal authority that require an assessment by a physician to make an RFC determination.

In Holloman, the court "note[d] with dismay that the plaintiff failed to cite for the court the many cases which disagree with Coleman [ ]. Counsel is reminded of his obligation of candor to the court." Holloman, 2013 WL 2903287, *5 n.7. This court is likewise dismayed by the failure of Plaintiff's counsel to disclose unfavorable cases and also reminds him of his duty of candor to the court, a duty that applies, if anything, with greater force where the unfavorable cases that must be reported to the court include those in which counsel personally participated.

[12] The court is satisfied that the ALJ's mental RFC assessment is supported by substantial evidence, in the form of the report of examining psychologist Dr. Horvat (not "Harvat" as consistently identified by Plaintiff) and the RFC assessments of non-examining psychologists Dr. Conger and Dr. Alidon. As outlined in the Medical History section, *supra*, and in the ALJ's discussion of the evidence, the reports of these psychologists adequately identify and account for limitations caused by Plaintiff's mental impairments. The reports are sufficient to support the ALJ's mental RFC finding that Plaintiff is able to perform simple, routine, repetitive tasks; understand, remember, and carry out simple instructions; adapt to gradual and infrequent changes in the work setting; maintain concentration and persistence for simple, routine, repetitive tasks; and perform work that requires only superficial interaction with the public and co-workers.

Dr. Holifield that has a projected effective date of May 24, 2009; the October 9, 2008, RFC assessment of non-examining physician Dr. Steele; and the June 9, 2009, pain assessment prepared by treating physician Dr. Simmons. The reports of Drs. Banner, Holifield, and Steele were all written well before the diagnosis and treatment of Plaintiff's osteomyelitis in her left hand—a serious bone infection from which Plaintiff apparently suffered from approximately April 2009 until October 2009 and which Plaintiff testified has rendered her unable to use her left hand or "lift and carry anything" (tr. 43–44; 46). The reports were also made prior to Plaintiff's diagnosis of osteoporosis in February 2009 (tr. 359) and the occurrence of a second, unexplained bone fracture in September 2009 (tr. 416). Thus, given the dates of their issuance, none of these reports could take into consideration Plaintiff's osteoporosis and her osteomyelitis or their potential long-term effects on Plaintiff's ability to use her left hand. Indeed, the actual condition and capacities of Plaintiff's left hand in May 2009, obviously are not accurately reflected in Dr. Holifield's July 14, 2008, RFC projection for that date. Nor is it clear that Dr. Steele's assessment for October 2008, which closely follows Dr. Holifield's assessment—including the finding of no manipulative restrictions—provides an accurate picture of Plaintiff's abilities and limitations pertaining to her left hand after October 2009. Further, when Dr. Banner examined Plaintiff in June 2008 her left wrist was still in a splint and therefore the arm and hand were not even tested. Dr. Simmons' pain assessment was made about six weeks prior to the surgery on Plaintiff's left hand, on the same date he diagnosed her with osteomyelitis, making it more timely than the other reports on which the ALJ relied. But the assessment does not indicate whether Dr. Simmons was evaluating Plaintiff's pain from her left hand and/or from some other source, such as fibromyalgia, as he makes no such distinction.[13] Moreover, the pain assessment does not address any functional limitations.

---

[13] The court recognizes that fibromyalgia "often lacks medical or laboratory signs, and is generally diagnosed mostly on a[n] individual's described symptoms," and that the "hallmark" of fibromyalgia is therefore "a lack of objective evidence." Moore v. Barnhart, 405 F.3d 1208, 1211 (11th Cir. 2005) (per curiam). Here, however, the non-disabling degree of pain described by Dr. Simmons seems consistent with his medical records as of June 2009 and, as such, supports the ALJ's RFC finding in this regard. As this matter is being remanded for the ALJ to reassess Plaintiff's RFC, however, the ALJ will have the opportunity to consider the effects of this impairment anew.

For these reasons, the court concludes that the reports or assessments by Drs. Banner, Holifield, Steele, and Simmons do not constitute substantial evidence in support of the ALJ's RFC determination.[14]  Given this conclusion, the court finds that remand is appropriate for further proceedings, including obtaining additional evidence in the form of a consultative examination and an assessment by Dr. Rehak, or other qualified physician, of Plaintiff's functional capacities and restrictions in her left hand.  Also, depending on the additional evidence obtained and the need for VE testimony at step five, it may be necessary for the ALJ to craft hypothetical questions to the VE that reflect those capacities and restrictions.

Grounds 3 through 5

In light of its determination that this matter should be remanded, the court need not address Plaintiff's allegations of error in Ground 3 concerning the ALJ's credibility determination.  On remand, the ALJ will be required to once again assess Plaintiff's RFC, a reassessment that will necessarily include evaluating the credibility of Plaintiff's allegations.  Thus the ALJ will have an opportunity to consider whether revision of his analysis concerning this issue is appropriate in light of any new evidence or findings.

Likewise, as this case is being remanded for further consideration of the ALJ's RFC determination, the court will make only the following observations with respect to Plaintiff's argument in Ground 4 that the ALJ committed reversible error by failing to assess work-related abilities on a function-by-function basis for his RFC assessment, as set forth in SSR 96-8p.[15]  Social Security Ruling

---

[14]  It appears that the only assessment of Plaintiff's left hand made after the bone infection had resolved by approximately October 2009 is the report by Dr. Rehak dated December 2, 2009, in which he makes no attempt to assess the extent of Plaintiff's capabilities or her limitations (tr. 639).  Although the ALJ discussed this report in his decision (tr. 21), he did not state the weight he accorded it in making his RFC assessment.  The court concludes that this report, by itself, is not enough to constitute substantial evidence in support of a RFC finding that Plaintiff is able to occasionally engage in handling-gross manipulation with her left hand, including the ability to lift as much as twenty pounds occasionally.

[15]  SSR 96-8p provides:

> The RFC assessment must first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function

96–8p does not require an ALJ to mechanically assess functions for which there is no credible evidence of impairment. The ALJ is not required to discuss irrelevant limitations or analyze relevant limitations about which there is no conflicting medical evidence. *See* Depover v. Barnhart, 349 F.3d 563, 567–68 (8th Cir. 2003). Plaintiff's apparent contention that in order to satisfy the requirements of SSR 96–8p the ALJ must provide a detailed assessment of *all* functions and analyze *all* possible limitations is without merit. Rather, the Eleventh Circuit has found that where an ALJ considers all of the evidence, determines that the claimant is not disabled, and also poses a hypothetical to a VE which limits the claimant to a certain level of exertional activity, he has complied with the requirements of SSR 96–8p. *See* Freeman v. Barnhart, 220 F. App'x 957, 960 (11th Cir. 2007).

In Ground 5 Plaintiff contends that the testimony of the VE is inconsistent with the DOT and, pursuant to SSR 00–4p,[16] the ALJ was required, but failed, to resolve this conflict before relying on the VE's testimony. As noted, on remand to reconsider Plaintiff's RFC it may be necessary for the ALJ to pose revised hypothetical questions to the VE. The court therefore will only address this argument to the following extent. Controlling caselaw in the Eleventh Circuit provides that if the testimony of a VE is inconsistent with a provision of the DOT, the testimony of the VE "trumps" the DOT. Jones, 190 F.3d at 1229–30. Moreover, SSR 00-04p does not expressly mandate that an ALJ independently investigate whether there is a conflict between the VE's testimony and the DOT. Rather, SSR 00-04p merely requires that the ALJ ask the VE if there is a conflict; if the VE identifies a conflict only then must the ALJ address the conflict in his decision and resolve it. *See*, *e.g.*, Martin

---

basis, including the functions in paragraphs (b), (c), and (d) of 20 CFR 404.1545 and 416.945. Only after that may RFC be expressed in terms of the exertional levels of work, sedentary, light, medium, heavy, and very heavy.

SSR 96-8p, 1996 WL 374184, *1 (July 2, 1996).

[16] According to SSR 00-4p, "[n]either the DOT nor the VE . . . automatically "trumps" when there is a conflict. The adjudicator must resolve the conflict by determining if the explanation given by the VE . . . is reasonable and provides a basis for relying on the VE . . . testimony rather than on the DOT information." SSR 00-4p, 2000 WL 1898704, *2 (Dec. 4, 2000).

v. Comm'r of Soc. Sec., 170 F. App'x 369 (6th Cir. 2006); Haas v. Barnhart, 91 F. App'x 942, 947–48 (5th Cir. 2004). In this case, the VE acknowledged his responsibility to advise the ALJ if there was any conflict between his opinion and the DOT (tr. 54), and at no point in his testimony did the VE advise of any conflict. Thus, in addition to the fact that in the Eleventh Circuit the VE's testimony "trumps" the DOT, the ALJ fulfilled his initial obligation under SSR 00-04p by inquiring whether a conflict existed. As the VE's testimony indicated there was no conflict, the ALJ was not required to investigate further. Thus the error claimed by Plaintiff is without merit.

VI.     CONCLUSION

For the reasons set forth above, the court concludes that the Commissioner's final decision is not supported by substantial evidence on the record as whole and that this case must be remanded for further administrative proceedings consistent with this Order. See 42 U.S.C. § 405(g); Foote, 67 F.3d at 1556 (remanding for additional administrative proceedings).

Accordingly, it is **ORDERED** that:

1.      Carolyn W. Colvin is substituted for Michael J. Astrue as Defendant in this action.

2.      Pursuant to sentence four of 42 U.S.C. § 405(g), the decision of the Commissioner is **REVERSED**. The Commissioner is directed to remand this case to the Administrative Law Judge for further proceedings consistent with this Order.

3.      The clerk is directed to close the file.

At Pensacola, Florida this 13th day of August 2013.


/s/ Elizabeth M. Timothy
**ELIZABETH M. TIMOTHY**
**UNITED STATES MAGISTRATE JUDGE**